**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————————

**AMPLIFY CAR WASH ADVISORS LLC,**
                    **Plaintiff,**                    **22-cv-5612 (JGK)**

         **- against –**                              <u>**MEMORANDUM OPINION**</u>
                                                       <u>**AND ORDER**</u>
**CAR WASH ADVISORY LLC, ET AL.,**
                    **Defendants.**
————————————————————————————

**JOHN G. KOELTL, District Judge:**

     The plaintiff, Amplify Car Wash Advisors LLC ("Amplify"),
filed this action against the defendants, Car Wash Advisory LLC
("CWA") and Harry Caruso ("Caruso"), alleging claims for
cybersquatting, 15 U.S.C. § 1125(d), common law trademark
infringement, 15 U.S.C. § 1125(a), unfair competition, N.Y. Gen.
Bus. Law § 349(a), and tortious interference with prospective
economic advantage; all arising out of the defendants' purchase
of the domain name "amplifycarwash.com." The plaintiff now moves
for partial summary judgment on the first two of these claims:
cybersquatting and common law trademark infringement.

     For the following reasons, the plaintiff's motion for
partial summary judgment is **granted.**

                                   **I.**

     The following facts are taken from the parties' Local Rule
56.1 statements, counterstatements, and supporting papers and
are undisputed unless otherwise noted.

The plaintiff, Amplify, was formed in 2020 and specializes in mergers and acquisitions, capital advising, site selection, and financial services for car wash businesses. Pl.'s 56.1 Statement of Facts ("Pl.'s 56.1 Statement") ¶¶ 1-2, ECF No. 75. Although Amplify was formed only four years ago, Amplify's founders have prior experience in the commercial real estate industry and one founder owns Commercial Plus, a commercial real estate brokerage firm founded in 1983 that also operates in the car wash industry. Id. ¶¶ 3, 34, 38. Amplify conducts business through its website, "amplifywash.com." Id. ¶¶ 28-31. Commercial Plus also operates a website under the domain name: "commercialplus.com." Id. ¶ 39.

Caruso formed CWA in 2019. Id. ¶ 11. CWA provides car wash businesses with services related to mergers and acquisitions, raising capital, and investment. Defs.' Resp. to Pl.'s 56.1 Statement of Facts ("Defs.' 56.1 Resp.") ¶ 7, ECF No. 80. Caruso is the sole founder, equity owner, and member of CWA. Pl.'s 56.1 Statement ¶¶ 13-14. At the time of CWA's founding, Caruso had no prior experience in the car wash industry. Id. ¶¶ 11-12. CWA conducts business, in part, through its website: "carwashadvisory.com." Id. ¶ 19.

In November 2021, both Amplify and CWA were exhibitors at "The Car Wash Show"—a convention for members of the car wash industry. Id. ¶ 40. Defendant Caruso attended the convention.

Id. ¶ 44. The parties had exhibitor booths in the same convention hall and Caruso interacted with Amplify employees at the convention. Id. ¶¶ 45, 47.

On November 18, 2021—one day after the convention—Caruso purchased three new website domains using his personal PayPal account: amplifycarwash.com, amplifywashes.com, and amplifycarwashes.com. Id. ¶¶ 49, 52. For a period of time, CWA's "amplifycarwash.com" domain redirected visitors to CWA's website, "carwashadvisory.com." Id. ¶ 55. The defendants contend that the website has not redirected to CWA's website since June 2022. Defs.' 56.1 Counterstatement of Facts ("Defs.' 56.1 Counterstatement") ¶ 81, ECF No. 80. On December 7, 2021, Caruso also purchased "commercialpluscarwash.com." Pl.'s 56.1 Statement ¶ 57. In total, CWA owns approximately seventy-five different URLs although it maintains only three websites. Id. ¶ 59.

The defendants contend that multiple search engine analytics sources showed no traffic to CWA's website originating from any domain containing the word "amplify" and no organic traffic to the contested domain names during the relevant period. See Defs.' 56.1 Counterstatement ¶¶ 82-84.[1] The parties

---

[1] The plaintiff contends that exhibits 3 and 4 which support these facts are unauthenticated hearsay for which no exceptions apply and therefore fail to comply with Local Rule 56.1 which requires that each statement "be followed by citation to evidence that would be admissible." See Pl.'s Resp. to Defs.' 56.1 Counterstatement ¶¶ 83-84, ECF No. 81.

dispute whether any of the amplify domains purchased by CWA can be found in a general web search and whether evidence that the domains cannot be found in a web search would be admissible. Pl.'s Resp. to Defs.' 56.1 Counterstatement ¶ 107.

On May 25, 2022, Amplify sent a letter to Caruso, advising him of the alleged unauthorized use of the domain name "amplifycarwash.com" and asking CWA to cease using the amplify mark and to transfer the allegedly infringing domain to the plaintiff. De Preter Decl., Ex. O, ECF No. 76. On May 31, 2022, the defendants replied and noted that "[a]s [the] letter does not mention any compensation for such transfer, it appears to be a thinly veiled attempt to intimidate our client into surrendering his property." Id., Ex. P.[2] The defendants then suggested that "the best resolution may be for [CWA] to cease usage of the domain and, in return, for [Amplify] to cease using the mark "Car Wash Advisors" in [Amplify's] title, website and marketing materials." Id.

In June 2022, Amplify sought to register the mark "Amplify Car Wash Advisors." Hadden Decl., Ex. 1, ECF No. 78. That application has been suspended because of a prior, potentially conflicting, pending application. Id., Ex. 2. In July 2022, the

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

plaintiff brought this action for cybersquatting, common law trademark infringement, unfair competition, and tortious interference with prospective economic advantage based on the defendants' alleged purchase of the domain "www.amplifycarwash.com." See Compl., ECF No. 3. In Amplify's prayer for relief, it requested injunctive relief, compensatory and punitive damages, and that the Court order the defendants to turn over the infringing domains. Id. ¶¶ 96-107.

In connection with this litigation, Caruso testified that he "always believed [it] to be [a] common marketing practice . . . to buy derivations on other versions of your name or associated names or competitor names." De Preter Decl., Ex. F. at 41:5-8. Caruso provided the rationale that purchasing related domains-including competitor domains—increased "domain authority" and would allow his business to perform better on search engines. Id. 43:4-16. He also testified that "[t]he big thing why we have these [domain names] is to prevent others from having them." Id. 44:2-3. Caruso's deposition also included the following exchange:

> Q: And through your ownership of amplifycarwash.com that's blocking your competitors from purchasing that same domain name; true, lie? . . .
>
> A: No, no. The answer is no, absolutely not no. It doesn't block them from buying it. It blocks them from buying it direct[ly] from a domain registrar.

Q: I am not sure I understand your answer. Are you saying that they could still buy it, they would just have to buy it from you?

A: Yeah. We offered to give it back to them, just to be clear.

Id. at 82:14-83:3.

The plaintiff has now moved for summary judgment on its cybersquatting and trademark infringement claims. ECF. No. 73. In Amplify's motion for partial summary judgment, it also contends that Caruso should be held individually liable for the claims. See Mem. of Law in Supp. of Mot. for Summ. J. at 21, ECF No. 74. The Court heard oral argument on the motion on January 10, 2025.

**II.**

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322—23 (1986); Gallo v. Prudential Residential Servs. L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it

does not extend to issue-resolution." Gallo, 22 F.3d at 1224.
However, "disputed legal questions . . . present nothing for
trial and are appropriately resolved on a motion for summary
judgment." Flair Broad. Corp. v. Powers, 733 F. Supp. 179, 184
(S.D.N.Y. 1990).

The moving party bears the initial burden of "informing the
district court of the basis for its motion" and identifying the
materials in the record that "it believes demonstrate the
absence of a genuine issue of material fact." Celotex, 477 U.S.
at 323. If the movant meets that burden, "the nonmoving party
must come forward with specific facts showing that there is a
genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith
Radio Corp., 475 U.S. 574, 587 (1986). At the summary judgment
stage, the court must resolve all ambiguities and draw all
reasonable inferences against the moving party. See id. The
substantive law governing the case will identify those facts
that are material and, "[o]nly dispute[] over facts that might
affect the outcome of the suit under the governing law will
properly preclude the entry of summary judgment." Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### III.

The plaintiff raises a claim for trademark infringement
under the Lanham Act, 15 U.S.C. § 1501, et seq. The Lanham Act

provides a cause of action against any person who, in connection with goods and services, uses in commerce:

> any word, term, name, symbol, or device, or any combination thereof . . . which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, [or] services . . . .

15 U.S.C. § 1125(a)(1). To prevail on a claim of trademark infringement, a plaintiff must show "(1) that the plaintiff[] hold[s] a valid mark entitled to protection; (2) that the defendant used the mark; (3) in commerce; (4) in connection with the sale or advertising of goods or services; (5) without plaintiff['s] consent; and (6) that the defendant's use of a similar mark is likely to cause confusion." Gym Door Repairs, Inc. v. Young Equip. Sales, Inc., 331 F. Supp. 3d 221, 250 (S.D.N.Y. 2018).

**A.**

The plaintiff claims two marks, as it made clear at oral argument on this motion: (1) "amplify car wash advisors" and (2) "amplify," as used within the context of the car wash financial services industry. Both marks are valid and entitled to protection. Although the plaintiff's marks are not registered, the Lanham Act protects unregistered trademarks from infringement. Now-Casting Econ., Ltd. v. Econ. Alchemy LLC, 628

F. Supp. 3d 501, 516 (S.D.N.Y. 2022). "[T]he general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). "The main difference is that the owner of the unregistered mark does not benefit from the presumption of validity created by federally registering the mark." See Now-Casting, 628 F. Supp. 3d at 516.

Before showing that a mark is valid and protectable, "a plaintiff [claiming infringement of an unregistered mark] must demonstrate its own right to use the mark . . . in question." ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 154 (2d Cir. 2007). A plaintiff possesses the right to use a mark "if it made the first use of the mark to identify his goods or service and continues to use the mark commercially." Now-Casting, 628 F. Supp. 3d at 516. In this case, the parties do not contest that Amplify has the right to use the amplify mark.

Next, for an unregistered mark to be protectable, the "mark must be sufficiently distinctive to distinguish" the mark owner's goods from those of others. Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 116 (2d Cir. 2006). To assess the distinctiveness of a mark, courts consider whether the mark is (1) generic; (2) descriptive; (3) suggestive; or (4)

9

fanciful or arbitrary. <u>Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.</u>, 973 F.2d 1033, 1039 (2d Cir. 1992).

Generic marks consist only of words identifying a category of goods or services. <u>Star Indus., Inc. v. Bacardi & Co. Ltd.</u>, 412 F.3d 373, 385 (2d Cir. 2005). Descriptive marks consist "of words identifying qualities of the product." <u>Id.</u> By contrast, suggestive marks, although not purely descriptive, "do suggest a quality or qualities of the product through the use of 'imagination, thought and perception.'" <u>Id.</u> (quoting <u>Time, Inc. v. Petersen Publ'g Co.</u>, 173 F.3d 113, 118 (2d Cir. 1999)). Finally, "[a]rbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion." <u>Id.</u>

Generic marks are unprotectable. <u>Bristol-Myers Squibb</u>, 973 F.2d at 1039; <u>see also</u> <u>RiseandShine Corp. v. PepsiCo, Inc.</u>, 41 F.4th 112, 120–21 (2d Cir. 2022) (observing that public recognition as a source identifier cannot "justify denying others the right to refer to their product as what it is"). Descriptive marks become protectable only when they acquire secondary meaning—"i.e. an acquired public recognition as a mark identifying the source." <u>RiseandShine</u>, 41 F.4th at 121; <u>Two Pesos</u>, 505 U.S. at 769. Meanwhile, suggestive and fanciful or arbitrary marks are inherently distinctive and are protectable without a showing of secondary meaning. <u>Bristol-Myers Squibb</u>,

973 F.2d at 1039 ("Suggestive, arbitrary and fanciful marks, because their inherent nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection."); see also Two Pesos, 505 U.S. at 768.

"Amplify" is defined as "to make something louder," or "to increase the size or effect of something." See Pl.'s 56.1 Statement ¶ 6. Amplify does not identify a category of products or the qualities of those products and therefore is not a generic or descriptive mark. However, "amplify" also is not fanciful or arbitrary. Imagination, thought, and perception link its definition—to "increase the size or effect of something"—to the plaintiff's business—an advisory service designed to grow car wash businesses. This link between the Amplify's mark and its business is particularly evident when "amplify" is used in conjunction with the word "wash" or "car wash"—as it is in the contested domain name.

Because "amplify" and "amplify car wash advisors" are suggestive marks, they are inherently distinctive even without acquired secondary meaning and are entitled to protection under the Lanham Act.

**B.**

Additionally, the defendants used the plaintiff's marks in commerce. Pursuant to the Lanham Act, a mark is used in commerce:

(1)  On goods when—

    A. it is placed in any manner on the goods or
       their containers or the displays associated
       therewith or on the tags or labels affixed
       thereto, or if the nature of the goods makes
       such placement impracticable, then on
       documents associated with the goods or their
       sale, and

    B. the goods are sold or transported in commerce,
       and

(2)  on services when it is used or displayed in
     the sale or advertising of services and the
     services are rendered in commerce . . . .

15 U.S.C. § 1127.

"[D]istrict courts in [the Second] Circuit and elsewhere
have sustained trademark infringement and Lanham Act unfair
competition claims where a defendant has used a competitor's
name as its own domain name, . . . ." Soter Techs., LLC v. IP
Video Corp., 523 F. Supp. 3d 389, 399 (S.D.N.Y. 2021)
(concluding that "use of [a] domain name . . . to redirect
customer traffic to its website constitutes a 'use in
commerce'"). For example, in OBH, Inc. v. Spotlight Mag., Inc.,
86 F. Supp. 2d 176, 185–86 (W.D.N.Y. 2000), a court held that
the use of the plaintiffs' trademark in the domain name of a
website that the defendant operated satisfied the use in
commerce requirement "because the website was used for
commercial purposes and affected plaintiffs' ability to offer

their services in commerce." <u>Soter Techs.</u>, 523 F. Supp. 3d at 399 (citing <u>OBH</u>, 86 F. Supp. 2d at 185–86).

In this case, both Amplify and CWA operated websites for commercial purposes. <u>See</u> Pl.'s 56.1 Statement ¶¶ 20, 56. At a minimum, CWA's temporary use of the "amplifycarwash.com" domain to redirect traffic to its own website constitutes a use in commerce. <u>See</u> <u>Soter Tech.</u>, 523 F. Supp. 3d at 399.

### c.

Because the defendants used the plaintiff's protected marks in commerce without the plaintiff's consent, the Court must consider whether the defendants' use of the domain name creates a likelihood of consumer confusion. Courts in this Circuit apply a multi-factor test, (the "<u>Polaroid</u> Test") to evaluate the likelihood of consumer confusion. <u>See</u> <u>Brennan's, Inc. v. Brennan's Rest., L.L.C.</u>, 360 F.3d 125, 130 (2d Cir. 2004). The test requires courts to consider (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products; (4) the likelihood that the plaintiff will bridge the gap; (5) actual confusion; (6) the defendant's good faith in adopting the mark; (7) the quality of the defendant's products; and (8) the sophistication of the buyers. <u>See</u> <u>Polaroid Corp. v. Polarad Elecs. Corp.</u>, 287 F.2d 492, 495 (2d Cir. 1961); <u>see also</u> <u>Lois</u>

Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 871-72 (2d Cir. 1986).

The first factor—the strength of the mark—does not strongly support the plaintiff. The plaintiff treats this factor as identical to the framework for evaluating the distinctiveness of a mark and concludes that because the two marks are inherently distinctive, they are strong. However, the Second Circuit Court of Appeals has "defined the strength of a mark as its tendency to identify the goods sold under the mark as emanating from a particular source." Lois Sportswear, 799 F.2d at 873. Accordingly, when evaluating the strength of a mark, courts consider both the degree of distinctiveness of a mark and whether it has acquired secondary meaning. See id. (concluding that the Levi Strauss back pocket stitching pattern was a strong mark because it had "a very strong secondary meaning" and that "[v]irtually all jeans consumers associate the stitching pattern with [Levi's] products"). In this case, the plaintiff has not demonstrated that the marks have acquired any sort of strong secondary meaning. Moreover, unlike in Lois Sportswear, the plaintiff's marks are suggestive, and suggestive marks "receive a narrower scope of protection than the protection accorded to arbitrary or fanciful marks." RiseandShine, 41 F.4th at 121.

By contrast, the second factor—the degree of similarity between the two marks—favors the plaintiff. The plaintiff's

14

mark, "amplify," is wholly contained in the allegedly infringing domain name. The mark "amplify car wash advisors" is almost entirely contained in the domain name. As a result, there is a high degree of similarity between the marks and the defendant's domain name.

The third factor—the proximity of the products—also favors the plaintiff. The plaintiff and the defendants offer overlapping services within the same industry. Both parties offer merger and acquisition advice and financial advice to car wash businesses. The defendant's use of the plaintiff's marks in one of its domain names therefore makes consumer confusion more likely. Any possible confusion may have been further exacerbated during the period when the "amplifycarwash.com" domain redirected to the defendants' website.

The fourth factor—bridging the gap—although closely related to the third factor, is not at issue in this case. "Under this factor, if the owner of a trademark can show that it intends to enter the market of the alleged infringer, that showing helps to establish a future likelihood of confusion as to source." Lois Sportswear, 799 F.2d at 874. These parties already operate within the same market. To the extent the defendants may offer services that the plaintiff does not, the plaintiff provides no indication that it intends to begin offering those services.

15

The defendants emphasize the fifth factor—actual confusion—to contend that the plaintiff has not established trademark infringement. Indeed, the plaintiff has failed to show any actual confusion. However, "it is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion." Lois Sportswear, 799 F.2d at 875. Although this factor weighs in favor of the defendant, it is not dispositive. Brennan's, 360 F.3d at 130 ("No single factor is dispositive, nor is a court limited to consideration of only these factors.").

The sixth Polaroid factor asks whether the defendant acted in good or bad faith in adopting the mark. "The inquiry into willfulness or bad faith considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product." Capri Sun GmbH v. Am. Beverage Corp., 595 F. Supp. 3d 83, 172 (S.D.N.Y. 2022). In this case, several factors indicate that the defendants acted in bad faith. Within twenty-four hours of encountering Amplify at the Car Wash Show, the defendants had purchased three domains containing Amplify's marks. Shortly thereafter, the defendants purchased a domain containing the mark of Commercial Plus—a closely related business. Moreover, the defendants apparently had a practice of

16

buying domain names and owned seventy-five such names. And importantly, at least temporarily, the "amplifycarwash.com" domain redirected to the defendant's website. Furthermore, Caruso testified that he purchased the alleged infringing domains in large part "to prevent others from having them" and to benefit his own business. Pl.'s Decl., Ex. F. at 44:2-3. In sum, Caruso's conduct suggests that he purchased the allegedly infringing domains to sell them to the owner of the infringed mark rather than to use them to identify CWA's own services.

Factor seven—the respective quality of the parties' products—neither hurts nor significantly helps the plaintiff's case. This factor "is primarily concerned with whether the inferior quality of a junior user's [services] could jeopardize the senior user's reputation." Bath & Body Works Brand Mgmt., Inc. v. Summit Ent., LLC, 7 F. Supp. 3d 385, 398 (S.D.N.Y. 2014). Although the plaintiff contrasts the Amplify executives' years of experience with the defendants' comparatively recent entry into the car wash industry, there is nothing to show that CWA's services are inferior in such a way as to jeopardize Amplify's reputation.

Finally, factor eight—the sophistication of the purchasers— favors the defendants. "This factor usually militates against a finding of a likelihood of confusion, though it might on occasion increase the likelihood of confusion, depending upon

17

the circumstances of the market and the products." Akiro LLC v. House of Cheatham, Inc., 946 F. Supp. 2d 324, 341 (S.D.N.Y. 2013). "Generally, the more inexpensive the product, the less careful the retail consumer is presumed to be" because confusion is "more likely where the goods are cheap and bought casually." Capri Sun, 595 F. Supp. 3d at 176 (quoting CJ Prod. LLC v. Snuggly Plushez LLC, 809 F. Supp. 2d 127, 156 (E.D.N.Y. 2011) & Louis Vuitton Malletier v. Dooney & Burke, 561 F. Supp. 2d 368, 389 (S.D.N.Y. 2008)) (concluding that buyers of inexpensive Capri Sun drink pouches were not sophisticated).

In this case, the plaintiff concedes that car wash mergers and acquisitions are not small transactions. Mem. of Law in Supp. of Mot. for Summ. J. at 20. However, Amplify contends that merger and acquisition advisory services are typically one-time transactions, and that customers do not acquire the repeat experience necessary to develop sophistication in the industry. Nevertheless, car wash owners seeking financial advice in connection with the purchase and sale of companies likely have greater business acumen and conduct more research than consumers who casually purchase inexpensive products. Factor eight therefore weighs in favor of the defendant.

Although the Polaroid factors cut in multiple directions, on balance, the Court finds that there was a likelihood of consumer confusion because of the similarity of the marks, the

proximity of the markets, and the defendant's bad faith.
Accordingly, because the plaintiff's marks are protectable and
because there is a likelihood of confusion, the plaintiff's
motion for summary judgment on its trademark infringement claim
is **granted.**

### IV.

The plaintiff also moves for summary judgment on its
cybersquatting claim. Congress passed the Anticybersquatting
Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), in part
"to protect consumers and American businesses" from "the bad-
faith and abusive registration of distinctive marks as Internet
domain names with the intent to profit from the goodwill
associated with such marks—a practice commonly referred to as
'cybersquatting.'" Sporty's Farm L.L.C. v. Sportsman's Market,
Inc., 202 F.3d 489, 495 (2d Cir. 2000). To allege a
cybersquatting claim, a plaintiff must show (1) that the
infringed-on mark is "distinctive or famous"; (2) that the
domain name is "identical or confusingly similar to" the mark;
and (3) that the alleged cybersquatter acted with a "bad faith
intent to profit." Id. at 497–99.

### A.

First, to plead a cybersquatting claim, the plaintiff must
show that the relevant mark is "distinctive or famous."
Distinctiveness and famousness are separate concepts. Id. at

19

497. "A mark may be distinctive before it has been used—when its fame is not existent," whereas "even a famous mark may be so ordinary, or descriptive as to be notable for its lack of distinctiveness." Id. Amplify contends that its mark is distinctive.

A federally registered mark is presumptively distinctive. Id. Alternatively, "a plaintiff can establish a mark as distinctive by showing that the mark is 'inherently distinctive,' i.e., intrinsically capable of identifying its source, or by demonstrating that the mark has acquired 'secondary meaning.'" Louis Vuitton Malletier, 454 F.3d at 116. Pursuant to the secondary meaning doctrine, marks that lack inherent distinctiveness may nevertheless be protected where they "ha[ve] become distinctive of the applicant's goods in commerce." Two Pesos, 505 U.S. at 769.

Courts apply the same distinctiveness continuum to questions of distinctiveness in the cybersquatting context. See, e.g., McAllister Olivarius v. Mermel, 298 F. Supp. 3d 661, 669 (S.D.N.Y. 2018); Monbo v. Nathan, 623 F. Supp. 3d 56, 125 (E.D.N.Y. 2022). Namely, courts classify marks as "(1) generic, (2) descriptive, (3) suggestive, [or] (4) arbitrary or fanciful." Bristol-Myers Squibb, 973 F.2d at 1039. Only suggestive and arbitrary or fanciful marks are "inherently

distinctive"—other marks must have acquired secondary meaning.
Two Pesos, 505 U.S. at 768.

As previously discussed with reference to the plaintiff's
trademark infringement claim, the plaintiff's "amplify" and
"amplify car wash advisors" marks are suggestive, not generic or
descriptive. The marks are therefore inherently distinctive, see
Bristol-Myers Squibb, 973 F.2d at 1039 ("Suggestive, arbitrary
and fanciful marks, because their inherent nature serves to
identify a particular source of a product, are deemed inherently
distinctive . . . ."); see also Two Pesos, 505 U.S. at 768, and
the plaintiff need not demonstrate that the mark acquired
secondary meaning to satisfy the first element of a
cybersquatting claim.

**B.**

Second, the court must evaluate whether the plaintiff's
marks—"amplify" and "amplify car wash advisors"—are confusingly
similar to the domain name—www.amplifycarwash.com.[3] To determine
whether a mark and a domain name are confusingly similar, courts
compare the "plaintiff's marks and defendants' domain names,

---

[3] Although the defendants purchased multiple domain names
containing the plaintiff's marks, in the complaint, the
plaintiff asserted a claim only with regard to
www.amplifycarwash.com. However, the Court may consider the
other domain names when evaluating whether the defendants acted
in bad faith.

including their intrinsic sound, sight, and meaning, without reference to goods or services with which the domain name is associated by the parties' use." Omega S.A. v. Omega Eng'g, Inc., 228 F. Supp. 2d 112, 127 (D. Conn. 2002). In this case, the plaintiff's claimed mark, "amplify," is wholly contained in the domain along with language identifying the type of business. The plaintiff's other mark, "amplify car wash advisors," has even greater overlap with the domain name. Therefore, although not identical, the domain name is clearly confusingly similar to the mark. The defendants concede as much in their opposition brief. See Opp. to Mot. for Summ. J. at 10-11, ECF No. 77.

### c.

Finally, the court must consider whether Caruso purchased the infringing domain with a bad faith intent to profit. See McAllister, 298 F. Supp. 3d at 672.[4] The ACPA contains nine factors for courts to consider in determining whether a defendant had a bad-faith intent to profit. Courts may look to:

> (I)    the trademark or other intellectual property rights of the person, if any, in the domain name;

---

[4] The Court already determined that the defendants acted in bad faith in its review of the Polaroid factors. However, bad faith in the cybersquatting context evaluates whether there was bad faith intent to profit, whereas bad faith in the likelihood of confusion context considers whether the defendant operated in good faith in adopting the mark. Moreover, the ACPA provides specific factors to assist courts in evaluating bad faith in the cybersquatting context.

(II)    the extent to which the domain name
        consists of the legal name of the
        person or a name that is otherwise
        commonly used to identify that person;

(III)   the person's prior use, if any, of the
        domain name in connection with the
        bona fide offering of any goods or
        services;

(IV)    the person's bona fide noncommercial
        or fair use of the mark in a site
        accessible under the domain name;

(V)     the person's intent to divert
        consumers from the mark owner's online
        location to a site accessible under
        the domain name that could harm the
        goodwill represented by the mark,
        either for commercial gain or with the
        intent to tarnish or disparage the
        mark, by creating a likelihood of
        confusion as to the source,
        sponsorship, affiliation, or
        endorsement of the site;

(VI)    the person's offer to transfer, sell,
        or otherwise assign the domain name to
        the mark owner or any third party for
        financial gain without having used,
        or having an intent to use, the domain
        name in the bona fide offering of any
        goods or services, or the person's
        prior conduct indicating a pattern of
        such conduct;

(VII)   the person's provision of material and
        misleading false contact information
        when applying for the registration of
        the domain name, the person's
        intentional failure to maintain
        accurate contact information, or the
        person's prior conduct indicating a
        pattern of such conduct;

(VIII)  the person's registration or
        acquisition of multiple domain names

23

> which the person knows are identical
> or confusingly similar to marks of
> others that are distinctive at the
> time of registration of such domain
> names, or dilutive of famous marks of
> others that are famous at the time of
> registration of such domain names,
> without regard to the goods or
> services of the parties; and
>
> (IX)   the extent to which the mark
>        incorporated in the person's domain
>        name registration is or is not
>        distinctive and famous within the
>        meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B)(i).

However, as the defendants note, the ACPA "expressly allows consideration of factors beyond the nine enumerated indicia" and "a number of courts—including the Second Circuit—have departed from strict adherence to the statutory indicia and relied expressly on a more case-specific approach to bad faith." Gioconda Law Grp. PLLC v. Kenzie, 941 F. Supp. 2d 424, 432-33 (S.D.N.Y. 2013); see also McAllister, 298 F. Supp. 3d at 673 ("Any unique circumstances, which do not fit neatly into the specific factors enumerated may also be considered and may be the most important grounds showing bad faith intent.")

Certain activities fall closest to the ACPA's heartland. See Gioconda, 941 F. Supp. 2d at 433. Two of these "quintessential examples" of bad faith include: (1) where a defendant purchases a domain name very similar to the trademark and then offers to sell the domain to the trademark owner at an

exorbitant price and, (2) where a defendant "intends to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's." Id. (quoting Utah Lighthouse Ministry v. Found. for Apologetic Info. & Rsch., 527 F.3d 1045, 1058 (10th Cir. 2008)).

In this case, several statutory factors indicate that the defendants acted in bad faith. CWA has no intellectual property rights in "amplify" or "amplify car wash advisors," see § 1125(d)(1)(B)(i)(I), and the domain name does not consist of a name commonly used to identify CWA, see § 1125(d)(1)(B)(i)(II). CWA also has never used the domain name in connection with the bona fide offering of any goods or services, see § 1125(d)(1)(B)(i)(III), and has not used the marks in connection with a bona fide noncommercial or fair use, see § 1125(d)(1)(B)(i)(IV). Additionally, the defendants registered "multiple domain names" that Caruso seemingly knew were "identical or confusingly similar to marks of [the plaintiff] that [were] distinctive at the time of registration of such domain names." See § 1125(d)(1)(B)(i)(VIII). In addition to the three "amplify"-related domain names that the defendants registered, the defendants purchased "commercialpluscarwash.com"

and apparently had a practice of buying domain names and owned seventy-five such names.[5]

Moreover, for a time, the "amplifycarwash.com" domain redirected to the defendant's own site. Although the plaintiff does not allege that this redirect was an attempt to "harm the goodwill represented by the mark," see § 1125(d)(1)(B)(i)(V), courts may look beyond the factors identified in ACPA and where a defendant intends to profit by diverting customers from the trademark owner's site to the defendant's site, "the case for bad faith is at its peak." See Gioconda, 941 F. Supp. 2d at 434.

Finally, the parties dispute whether the defendants "offer[ed] to transfer, sell, or otherwise assign the domain name to the mark owner . . . for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of goods or services." See § 1125(d)(1)(B)(i)(VI). Caruso asserts that he has "repeatedly offered to surrender the domains," Opp. to Mot. for Summ. J. at 14, and testified that he "offered to give [the domain] back to them, just to be clear," De Preter Decl., Ex. F at 83:2-3. Caruso appears to refer to CWA's response to Amplify's cease and desist letter. See id., Ex. P. In that letter the defendants offered to surrender the

---

[5] Although the complaint only raises a claim regarding one of the three domain names, all can be considered for the purpose of establishing bad faith.

domains in exchange for Amplify ceasing to use the phrase "car wash advisors" on its site. The defendants contend that this was merely an offer of "mutual exchange," and not indicative of an intent to profit. Opp to Mot. for Summ. J. at 14. However, the fact that the "offer to settle was noncommercial makes no difference since the ACPA does not require commercial activity or gain as an element of liability." McAllister, 298 F. Supp. 3d at 675.

When considered in their totality, the uncontested facts underlying this case give rise to an inference that the defendants acted in bad faith as a matter of law. Within twenty-four hours of encountering Amplify, the defendants purchased three domains containing Amplify's marks. Shortly after, the defendants purchased a domain containing the mark of Commercial Plus—a business closely related to the plaintiff. At least temporarily, the "amplifycarwash.com" domain redirected to the defendant's own website. Caruso testified that he purchased the infringing domains in large part "to prevent others from having them" and to benefit his own business. Accordingly, the plaintiff's motion for summary judgment on the cybersquatting claim is **granted.**

**V.**

Finally, the plaintiff moves for summary judgment on its claim that Caruso should be held personally liable for cybersquatting and trademark infringement. "It is well-established in the Second Circuit that under the Lanham Act, a corporate officer may be held personally liable for trademark infringement and unfair competition if the officer is a moving, active, conscious force behind the defendant corporation's infringement." KatiRoll Co., Inc. v. Kati Junction, Inc., 33 F. Supp. 3d 359, 367 (S.D.N.Y. 2014). "A showing that the officer authorized and approved the acts of unfair competition which are the basis of the corporation's liability is sufficient to subject the officer to personal liability." Cartier v. Aaron Faber, Inc., 512 F. Supp. 2d 165, 170 (S.D.N.Y. 2007).

Caruso is CWA's sole founder, equity owner, and manager. Pl.'s 56.1 Statement ¶¶ 13-14. He has sole authority to make binding decisions on behalf of CWA. Id. ¶ 16. Caruso used his personal PayPal account to purchase the amplify domain names after attending the car wash industry convention. Id. ¶¶ 49, 52, 54. Caruso also testified extensively to his rationale for buying domain names, lending credence to the conclusion that he carried out, "authorized and approved the acts" that form the basis of the complaint in this case. Accordingly, Caruso should

be held individually liable for CWA's infringement and
cybersquatting.

## CONCLUSION

The Court has considered all of the parties' arguments. To
the extent not specifically addressed, those arguments are
either moot or without merit. For the foregoing reasons, the
plaintiff's motion for partial summary judgment is **granted**. The
Clerk is directed to close ECF No. 73.

SO ORDERED.
Dated:    New York, New York
          March 10, 2025

                                    John G. Koeltl
                           United States District Judge